**NATIONAL CONGRESS OF HISPANIC AMERICAN CITIZENS et al.**

v.

**William J. USERY, Secretary of Labor, Appellant.**

**No. 76–1009.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 27, 1977.

Decided April 19, 1977.

Rehearing Denied June 1, 1977.

Marc R. Hillson, Atty. U. S. Dept. of Labor, Washington, D. C., with whom Michael H. Levin, Counsel for Appellate Litigation U. S. Dept. of Labor, Washington, D. C., was on the brief, for appellant.

H. Michael Semler, Washington, D. C., with whom Lester N. Scall, Washington, D. C., was on the brief, for appellees.

Before Mr. Justice CLARK,* of the Supreme Court of the United States, and MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by Justice CLARK.

Mr. Justice CLARK:

This appeal by the Secretary of Labor (The Secretary), appellant, seeks the reversal of a summary judgment entered against him and favorable to The National Congress of Hispanic Americans and five of its members (El Congreso), Appellees. El Congreso, whose members are farm workers, sought the promulgation under The Occupational Safety and Health Act of 1970 (OSHA) of safety and health standards in the areas of field sanitation, roll over protective structures (ROPS), machinery guarding equipment, personal protective equipment, nuisance dust and noise. The Secretary had filed a cross-motion for summary judgment which was denied, and a final judgment was entered on October 7, 1975, which provided:

Ordered that plaintiffs' summary judgment should be and the same hereby is granted; and it is further

Ordered that defendant's motion for summary judgment be and the same hereby is denied; and it is further

Ordered that judgment be entered for the plaintiff.

No other judgment was entered, and it is necessary to look to the accompanying opinion of the court and the pleading to ascertain the content of the judgment. We find such a final judgment order wholly inadequate, especially in light of the breadth of the relief requested by El Congreso, the claim of the Secretary that some of the OSHA standards have been promulgated and the general nature of the opinion of the trial judge. However, the point has not been raised, and the parties apparently understand the judgment's coverage as indicated by their respective briefs. We do believe that the better practice would be for the trial judge to recite in the final judgment the specific relief granted, as well

* Mr. Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a).

as that denied. We will deal with the merits of the case as treated by the briefs of the parties.

### 1. *The Coverage of the Act.*

The Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.* 84 Stat. 1590, was designed to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . ."[1] The enormity of the problem is shown by the fact that there are some 65,000,000 workers engaged in their respective labor in approximately 5 million workplaces.[2] The Secretary was assigned the task of accomplishing the goals of the Act through the promulgation and enforcement of "standards" that require employers to provide safe and healthful employment and working conditions for their employees. Two means by which standard development is provided by the Act are: Section 6(c), which authorizes temporary emergency standards (not involved here) to be issued without notice, if the Secretary finds that certain groups of employees are exposed to "grave danger" from a hazard, requiring emergency standard protection. The other means is found in Sections 6(b)(1) through (4) of the Act which prescribe a full scale notice and comment procedure for the development of permanent occupational safety and health standards, including timetables covering each step of the rule-making procedure. Under these sections, The Secretary may initiate rule-making on his initiative alone by publishing a proposed standard or seek the recommendations of an advisory committee by having it submit a proposed standard to him for consideration. After the latter of these procedures is invoked, the proposed standard moves through several statutory steps, each of which has a maximum timetable in which the step must be completed. The specific timetable for each step is: (1) The Advisory Committee shall propose a standard within 270 days; The Secretary shall publish this proposed standard within 60 days after its receipt, following which comments by interested parties must be filed in 30 days; within 30 days after the last day for filing comments on the proposed standard, the Secretary shall specify the time and place for a hearing on the same; and within 60 days after the hearing, the Secretary shall issue the standard or determine that it shall not be issued.

### 2. *The Issue Involved* :

The sole issue involved is whether Congress meant for the timetable in Section 6(b)(1) through (4) of the Act to be mandatory. El Congreso insists that the words of the Act are mandatory and were deliberately used by the Congress to insure the swift issuance of the standards involved. The Secretary, on the other hand, urges that there must be some leeway because of the great demand from various working groups in literally hundreds of occupations and the limited resources of his Department. It is his contention that the Congress ordered him to make a rational priority choice between those occupations experiencing severe hazards to health which require immediate resource allocations and those having less serious health problems whose deferment will not cause such hazardous consequences. In support of his contention, The Secretary points to Section 6(g), which provides:

> In determining the priority for establishing standards under this Section, the Secretary shall give due regard to the urgency of the need for mandatory safety and health standards for particular industries, trades, drafts, occupations, businesses, work-places or work environments . .

In proposing this amendment to the Act, Senator Javits stated that his purpose was "to relieve The Secretary of the necessity of waiting to promulgate whatever standards he wishes to promulgate across the board but, rather, allowing him to yield to more

---

1. 29 U.S.C. § 651(b).

2. The President's Report to the Congress on Occupational Safety and Health for 1973, pp. 57–60 (1975).

urgent demands before he tries to meet others . . ."

El Congreso argues that Section 6(g) relates to the Secretary's choice of areas in which to develop standards, rather than to the procedures by which they are developed; that the provision insures that The Secretary may have flexibility to develop standards on a hazard-by-hazard basis, rather than waiting to act only when he has completed standards "across the board" for an entire industry. Moreover, El Congreso says that there is nothing in the Senator's statement which suggests that the timetables are being nullified.

On the other hand, The Secretary asserts that his approach does not nullify the timetables but gives full effect to them. He points out that the claims of 6(b)(1) through (4) and the requirement of Section 6(b)(5) commanding that the Secretary "set the standard which most adequately assures [lifelong health and safety] . . . on the basis of the best available evidence" are not in conflict. In addition, The Secretary points out that since the Act's inception, he has annually been served with 75–100 major petitions formally requesting standards, each of which competes with numerous others in the rulemaking process. Stringent priority choices are accordingly mandated in order to serve the objectives of the Act. The Secretary points to one area in regard to priorities as an example of what he often faces. One month after the complaint was filed here, workers in the giant plastic industry complained to the Secretary of their exposure to vinyl chloride gas, which developed a fatal liver cancer, angiosarcoma. This required a massive shift of resources needed to conduct a fact-finding hearing and initiate emergency standards consuming a period exceeding six months.

The Secretary further points out that it was undisputed in the District Court at the time of the decision there that agriculture was not a uniformly hazardous occupation, that the great bulk of agricultural fatalities occur in over the road transport or in fami-ly farms, not covered by the Act; that pesticide use, tractor roll overs and unguarded machinery are the most serious farm hazards and that standards have been adopted on each on a "worst-first" basis,[3] and it was equally undisputed that the Secretary was proceeding reasonably to develop all such standards in the light of their priority choices.

## 3. The Secretary's Discretion:

■ The trial judge held that Section 6(g) was legally irrelevant and that the failure of the Secretary to meet the statutory timetables of Section 6(b)(1) through (4) was per se unlawful. The District Court gave no reasons why Section 6(g) was irrelevant. We note, however, that El Congreso admits that "The Secretary has discretion to allocate his limited resources among their contending uses" but that the trial judge was right in holding that Section 6(g) was irrelevant; and, moreover, OSHA's limited resources were likewise irrelevant to the issue here. The Act has built in flexibilities that the Secretary may use, such as his right to initially determine whether or not there will be a standard; what the standard will be; the priorities between the various occupations that may require standards; the altering and changing of those priorities even though once set; the forgiving of inaction where the Secretary makes a contemporaneous statement of reasons; the right to delay hearings; to process higher-priority standards more quickly than initiated ones; and, finally, the Secretary's right to refuse to adopt any standards even though the whole process has been exhausted. Despite all these admissions of discretion in the Secretary, El Congreso says that once the inexorable process is begun, it must grind on and on to its statutory end even though the Secretary has long before decided to refuse to adopt it. This makes an absurdity of the Act and a fool out of Congress. We cannot agree. Since the Congress left such open-ended discretion in the Secretary at many key points in the

**3.** The pesticide standard was promulgated in 1974. See *Organized Migrants in Community* *Action v. Brennan,* 172 U.S.App.D.C. 147, 520 F.2d 1161 (1975).

**1200**

Act, including Section 6(g), we find implicit acknowledgment that traditional agency discretion to alter priorities and defer action due to legitimate statutory considerations was preserved. If the Secretary may rationally order priorities and re-allocate his resources at the point when 6(b)(1) through (4) becomes applicable, he should be able to do so at any rulemaking stage, so long as his discretion is honestly and fairly exercised. To hold otherwise would encourage refusals to initiate rulemaking and create incentives to deceive which anyone, including El Congreso, decries. As we see it, there is no sense in proceeding completely through the rulemaking process in accordance with El Congreso's claim that it is mandatory only to end up with the Secretary issuing a notice that the standard is not adopted.

▪ We understand that only three standards remain out of the six originally involved, *viz*, field sanitation, nuisance dust and noise, each of present comparatively low priority hazards. Upon remand the trial court should require the Secretary to file a report as to the present situation on each of these proposed standards, including the timetables governing each. If the court is not satisfied as to the sincerity of the effort of the Secretary in the processing of such standards, it should take such action as the circumstances require; if it is satisfied as to the same, it should hold the case on the docket for further report from the Secretary on the issuance of the standards.

All we have said here is on the assumption that the Secretary is acting honestly and fairly in the selection of priorities, an assumption we adopt since no claim is made to the contrary.

*It is so ordered.*