626 F.2d 882

NATIONAL CONGRESS OF HISPANIC
AMERICAN CITIZENS (EL CONGRE-
SO) et al., Appellees,

v.

Ray MARSHALL, Secretary of United
States Department of Labor, et
al., Appellants.

No. 79–1228.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 11, 1979.

Decided Dec. 27, 1979.

Nancy L. Southard, Acting Asst. U. S. Dept. of Labor Counsel, Washington, D. C., with whom Allen H. Feldman, Acting Counsel and Domenique Kirchner, Atty., U. S. Dept. of Labor, Washington, D. C., were on brief, for appellants.

Leslie A. Sussan, New York City, a member of the bar of the Supreme Court of New York, pro hac vice, by special leave of Court with whom H. Michael Semler, Washington, D. C., and John F. Ebbott, Christiansburg, Va., were on brief, for appellees.

Before LEVENTHAL[*] and WILKEY, Circuit Judges and OBERDORFER,[**] United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

The Secretary of Labor appeals from a judgment of the district court directing him to complete development of a field sanitation standard as quickly as possible and to present to that court for its approval a timetable indicating when the standard would be completed.[1] We reverse and remand for further consideration.

## I. BACKGROUND

A. *The History of the Litigation*: In December, 1973, the National Congress of Hispanic American Citizens (El Congreso) filed this action to compel the Secretary of Labor to promulgate safety and health standards for the agricultural industry, specifically identifying standards governing field sanitation, farm safety equipment, roll-over tractor protection, personal protective equipment, nuisance dust and noise.[2] El Congreso argued that, by not issuing these standards within a designated time after he had begun action on them, the Secretary had abused his discretion and had unlawfully withheld and unreasonably delayed agency action in violation of § 6(b)(1)–(4) of the Occupational Safety and Health Act of 1970.[3] The district court,

---

[*] Judge Leventhal authored this opinion but died before it was released.

[**] Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. *National Congress of Hispanic American Citizens v. Marshall* (Civil Action No. 2142-73, December 21, 1978). Appendix to Secretary of Labor's Brief (App.) at 166.

2. El Congreso had petition the Occupational Safety and Health Administration (OHSA) in September, 1972, for the promulgation of these standards. Subsequently, the agency promulgated a roll-over tractor protection standard, 29 C.F.R. 1928.51 (1978), 40 Fed.Reg. 18,254 (April 25, 1975), and a farm machinery guarding standard. 29 C.F.R. 1928.57 (1978), 41 Fed.Reg. 10,190 (March 9, 1976).

3. 29 U.S.C. § 655(b)(1)–(4) (1975). The statute provides in relevant part:

    The Secretary may by rule promulgate, modify, or revoke any occupational safety or health standard in the following manner:

    (1) Whenever the Secretary, upon the basis of information submitted to him in writing by an interested person, a representative of any organization of employers or employees, a nationally recognized standards-producing organization, the Secretary of Health, Education, and Welfare, the National Institute for Occupational Safety and Health, or a State or political subdivision, or on the basis of information developed by the Secretary or otherwise available to him, determines that a rule should be promulgated in order to serve the objectives of this chapter, the Secretary may request the recommendations of an advisory committee appointed under section 656 of this title. The Secretary shall provide such an advisory committee with any proposals of his own or of the Secretary of Health, Education, and Welfare, together with all pertinent factual information developed by the Secretary or the Secretary of Health, Education, and Welfare, or otherwise available, including the results of research, demonstrations, and experiments. An advisory committee shall submit to the Secretary its recommendations regarding the rule to be promulgated within ninety days from the date of its appointment or within such longer or shorter period as may be prescribed by the Secretary, but in no event for a period which is longer than two hundred and seventy days.

    (2) The Secretary shall publish a proposed rule promulgating, modifying, or revoking an occupational safety or health standard in the Federal Register and shall afford interested

holding that mandatory time frames are triggered once the Secretary begins action on a standard, ordered the Secretary to publish a final farm machinery guarding standard, and to proceed, according to the time frames of § 6(b), with publishing final protective equipment and field sanitation standards.[4] Since the district court believed that any departure from the statutory timetable violated the Act, it did not examine the Secretary's criteria for setting the priorities that led to delay in issuing the particular standards in dispute, it did not reach the question of whether that delay constituted an abuse of discretion, and it made no finding regarding the relative need for a field sanitation standard or any other standard.

On appeal, we reversed stating, in our 1977 opinion, that the mandatory language of the Act did not negate the "implicit acknowledgement that traditional agency discretion to alter priorities and defer action due to legitimate statutory considerations was preserved."[5] We pointed out that the Secretary may "rationally order priorities and reallocate his resources at any rulemaking stage" so long as "his discretion is honestly and fairly exercised."[6] We ordered the trial court to require the Secretary to file a report on the situation with regard to each proposed standard, including timetables for their development.[7] We stated that if the district court was satisfied with the sincerity of the Secretary's effort, it should hold the case for further reports; but that if it was not so satisfied, it should act accordingly.[8]

On December 26, 1978, in a memorandum opinion and final order, the district court concluded its consideration upon remand with respect to the standard for field sanitation. Finding that "the Secretary [had] not established any criteria which would enable the Court to determine that the agency [had] acted in a rational manner," the district judge concluded that the Secretary's refusal to complete a field sanitation standard was inconsistent with the requirements of the Act and the mandate of this court, and that, therefore, the Secretary "must be directed to complete development of a field sanitation standard . . . as soon as possible."[9]

The Secretary appealed and sought and obtained from us a stay of the district court

persons a period of thirty days after publication to submit written data or comments. Where an advisory committee is appointed and the Secretary determines that a rule should be issued, he shall publish the proposed rule within sixty days after the submission of the advisory committee's recommendations or the expiration of the period prescribed by the Secretary for such submission.

(3) On or before the last day of the period provided for the submission of written data or comments under paragraph (2), any interested person may file with the Secretary written objections to the proposed rule, stating the grounds therefor and requesting a public hearing on such objections. Within thirty days after the last day for filing such objections, the Secretary shall publish in the Federal Register a notice specifying the occupational safety or health standard to which objections have been filed and a hearing requested, and specifying a time and place for such hearing.

(4) Within sixty days after the expiration of the period provided for the submission of written data or comments under paragraph (2), or within sixty days after the completion of any hearing held under paragraph (3), the Secretary shall issue a rule promulgating, modifying, or revoking an occupational safe-

ty or health standard or make a determination that a rule should not be issued. Such a rule may contain a provision delaying its effective date for such period (not in excess of ninety days) as the Secretary determines may be necessary to insure that affected employers and employees will be informed of the existence of the standard and of its terms and that employers affected are given an opportunity to familiarize themselves and their employees with the existence of the requirements of the standard.

4. *National Congress of Hispanic American Citizens v. Dunlop*, 425 F.Supp. 900, 903 (D.C.D.C. 1975).

5. *National Congress of Hispanic American Citizens v. Usery*, 180 U.S.App.D.C. 337, 341, 554 F.2d 1196, 1200 (1977).

6. *Id.*

7. *Id.*

8. *Id.*

9. Memorandum Opinion at 5. Appendix to the Secretary of Labor Brief (App.) at 170.

order. *Sua sponte,* we ordered expedited treatment.

B. *The History of the Field Sanitation Standard*: In September, 1972, El Congreso petitioned the Secretary to promulgate six safety and health standards, including a field sanitation standard. When by December, 1973, the Secretary had neither issued these standards nor published a finding that they should not be issued, El Congreso brought this action.[10] Prior to the initial decision of the district court (*Hispanic I*),[11] the field sanitation standard had been referred by the Secretary to the Standards Advisory Committee on Agriculture (SACA). That committee gathered oral and written testimony from the agricultural and medical communities, and in December, 1974, it approved the recommended standard and submitted it to the Secretary. It was the Secretary's failure to act upon this recommendation within 60 days that prompted the district court to find a violation of the statutory timetable[12] in *Hispanic I.*

In April, 1976, the Secretary published a proposed field sanitation standard.[13] Specifically, he proposed requiring that agricultural employers provide potable drinking water for field employees in order to reduce human strain resulting from excessive heat,[14] and he proposed requiring that toilet and handwashing facilities be provided so as to reduce transmission of infection and disease.[15] The statement accompanying the proposals indicated that field sanitation standards were necessary to protect the safety and health of agricultural workers and to give effect to the congressional desire that agricultural employees be brought into the mainstream of the American labor force.[16]

In April 1977, we rendered our decision in *Hispanic I,* reversing the district court's finding that the Act's timetables were mandatory and remanding the case with instructions that the court require the Secretary to file a report and timetable regarding the field sanitation standard. On September 6, 1977, the Secretary filed his report with the district court.[17] In it, he said the field sanitation standard was a relatively low priority which, because of the press of other rulemaking proceedings, would receive no further consideration for at least one year, during which time its status would be reviewed.[18] This determination had been reached, he said, after a review of the agency's rulemaking priorities, especially with regard to three criteria: (1) the number of employees exposed to an unregulated hazard; (2) the severity of such hazards; and (3) the agency resources which would have to be expended to develop adequate regulations covering a given hazard.[19] In the Secretary's view, a field sanitation standard simply had to wait:

> The agency regards a field sanitation standard as a matter of low priority. The hazards from lack of such a standard include transmission of bacteria and infection, and bladder disease. In the agency's judgment, these hazards are neither as serious as those presented by the substances, agents or physical conditions with respect to which rulemaking has been initiated, nor as serious as those presented by other substances for which rulemaking has not begun. In addition we must take into account that rulemaking in this area would be quite lengthy and would involved a substantial resource

---

10. Two of the six standards were eventually promulgated. *See* note 2, *supra.*

11. *National Congress of Hispanic American Citizens v. Dunlop,* 425 F.Supp. 900 (1975).

12. *Id.* at 903.

13. 41 Fed.Reg. 17,576 (April 27, 1976).

14. *Id.* at 17,577.

15. *Id.*

16. *Id.* at 17,576–78.

17. We refer interchangeably to the Secretary, and the Assistant Secretary charged with administering the Occupational Safety and Health Act, Dr. Eula Bingham, who was in charge of these proceedings.

18. App. at 40.

19. App. at 39.

allocation. While as the proposed rule, 41 Fed.Reg. 17576, indicates, there are some ill effects which may result to employees, from the absence of a field sanitation standard, rational resource allocation demands that the more pressing standards . . . be developed first.[20]

El Congreso was not satisfied with the Secretary's conclusion, arguing that the report did not sufficiently detail priorities, that it did not explain why some standards should take precedence over a field sanitation standard, and that it did not sufficiently detail the resources available to the Secretary, El Congreso requested additional discovery to further explore the basis of the Secretary's decision. The district court agreed, and in May, 1978, El Congreso served the Secretary with 162 interrogatories.

In response to the interrogatories, the Secretary elaborated upon his earlier statement of the factors entering into the priority-setting process. He distinguished health standards from safety standards. For the former, he said that he considered: the number of workers exposed to particular unregulated hazards; the severity of such hazards; the existence of research relevant to hazard identification and methods of hazard control; the recommendations of the National Institute for Occupational Safety and Health (NIOSH); petitions for standards on the hazards; and court decisions and other factors affecting the enforceability of the standard. Severity was noted as the most important consideration.[21] In the safety area, the factors identified as important by the Secretary were slightly different. They included: the number of workers exposed to particular unregulated hazards; the illness or injury incidence of the affected worker group; the nature and severity of the hazard exposure; the need for classification, simplification and/or revision to improve compliance with the enforceability of an existing standard; changes in the

state of the art in work practices; court or Occupational Safety and Health Review Commission decisions affecting the enforceability of existing standards; availability of research and other information relevant to hazard identification and methods of hazard control; the recommendations of NIOSH; Advisory Committee deliberations; and petitions for standards on the hazard.[22] Even after setting forth these lists, however, the Secretary stressed his view that the priority setting process was not susceptible to a "mathematical formula or [a] formal weighing scheme. . . ."[23] It was his judgment, based upon all of these considerations, that consideration of the field sanitation standard properly had been delayed.

In August, 1978, the district court ordered the Secretary to file a timetable specifying when the standard would be issued. The Secretary complied, providing a timetable on September 22, 1978, which indicated:

Based upon objective agency priorities and available resources previously detailed in the Secretary's Report of September 6, 1977, and further amplified in the Secretary's responses to plaintiff's interrogatories, the Occupational Safety and Health Administration (OSHA) has devised a schedule of regulations and related projects on which substantial work will be performed within the next 18-month period. At the present time, the development of a field sanitation standard does not appear on the agency's 18-month planning horizon because of both generally limited agency resources and the relatively low priority assigned to these particular standards. The priorities assigned are, however, periodically reviewed and any new information considered in determining whether specific hazards should be reprioritized.[24]

The timetable listed 15 health and 18 safety standards to which agency resources would be devoted during the 18-month period.

20. App. at 55.

21. App. at 78.

22. App. at 79–80.

23. App. at 81.

24. App. at 161.

El Congreso moved the district court to rule that the Secretary had failed to articulate rational criteria for the development of standards, and that he was abusing his discretion by refusing to develop and issue a field sanitation standard. On December 21, 1978, in response to this motion, the district court rendered the final order and memorandum opinion which are the subject of this appeal (*Hispanic II*).[25]

On January 22, 1979, the Secretary's office, reacting to the district court's order, filed with the district court the "Secretary's Timetable for Development and Implementation of the Field Sanitation Standard." [26] It set forth a schedule for the development of a field sanitation standard.

> Based upon available agency resources, the Occupational Safety and Health Administration (OSHA) has devised a schedule for . . . promulgating the field sanitation standard as soon as possible is as follows:
>
> a.  January 22, 1979-May 18, 1979.  Development of proposed rule to include preamble, internal and external reviews, and economic assessment. OSHA has evaluated the record of comments on its earlier field sanitation proposal (41 FR 17576, April 26, 1978) and concluded that a new proposed rule is needed.
>
> b.  May 22, 1979-July 20, 1979.  Publication of proposal in Federal Register and period for receipt of written comments.
>
> c.  August-September 1979.  Regional public hearings.
>
> d.  October 19, 1979.  Record closed after receipt of post-hearing comments.
>
> e.  October 21, 1979-December 21, 1979. Development of final rule and preamble including all reviews and final economic assessment.
>
> f.  December 28, 1979.  Publication of final rule in the Federal Register.

This schedule reflects the projected minimum time in which the Secretary may promulgate a field sanitation standard.

> Furthermore, any schedule for promulgating a filed sanitation standard as soon as possible is only a tentative projection which may be substantially altered by future circumstances.  The Secretary is developing numerous regulations for worker health and safety. . . . Any estimates regarding the time needed to complete these projects [are] merely tentative. . . . New information brought to OSHA's attention . . . may result in reprioritization of the hazards listed or in the addition of new hazards to the list.  Moreover, the Act requires the Secretary to issue an emergency temporary standard (ETS) effective upon publication in the Federal Register if he determines "that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards and . . . that such emergency standard is necessary to protect employees from such danger." 29 U.S.C. 655(c).  OSHA's recent experience has shown that ETS's frequently are issued and that the circumstances requiring ETS's are likely to increase.  The promulgation of any ETS results in considerable dislocation of OSHA's resources and substantially alters OSHA's plan for developing standards within the next 18 months.[27]

Nine days after the schedule was submitted, the Secretary moved to withdraw it. He contended that since he had filed a notice of appeal and an application for a stay of the district court's order pending appeal, the timetable was not properly before the district court.  Moreover, the Secretary averred that the timetable was submitted while Dr. Bingham, the OSHA official in charge of the area, was out of the country; it, therefore, did not accurately present the official position of the agency's

25. *National Congress of Hispanic American Citizens v. Marshall* (Civil Action No. 2142–73, December 21, 1978).  App. at 166.

26. App. at 171.

27. App. at 171–72.

capacity to complete the standard; indeed, Dr. Bingham, upon her review of the timetable, had concluded that the timetable could not possibly be met.[28] The district court held that, since the appeal was pending in our court, it lacked jurisdiction to act on the Secretary's request that the timetable be withdrawn. It is thus part of the case before us.

## II. ANALYSIS

■ On several important issues, the parties agree. The Secretary does not deny that in the case of the field sanitation standard he has departed from the timetables set forth in 29 U.S.C. § 655(b). El Congreso does not contest the authority of the Secretary to set priorities for OSHA and to allocate the resources available to him. Finally, since the decision of our court in *Hispanic I*,[29] it has been clear that the timetables set forth in 29 U.S.C. § 655(b) are not etched in stone, that they do not so circumscribe the discretion of the Secretary that his failure to act within their limits is, by itself, an abuse by him of his discretionary powers. So long as his action is rational in

the context of the statute, and is taken in good faith, the Secretary has authority to delay development of a standard at any stage as priorities demand.[30] The issue before us, therefore, is whether the Secretary's action in the instant case was rational and taken in good faith.

A. *Was the Secretary's Action Rational?*

The Secretary has delayed action on the field sanitation standards because he has given priority to the development of other standards. El Congreso argues that this setting of priorities was irrational. The district court agreed, concluding that "the Secretary [had] not established any criteria which would enable the Court to determine that the agency [had] acted in a rational manner."[31] We disagree.

■ On this review, a court examines agency action to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[32]

To make [such a] finding the court must consider whether the decision was based

---

**28.** App. at 175–76.

**29.** *National Congress of Hispanic American Citizens v. Usery*, 180 U.S.App.D.C. 337, 554 F.2d 1196 (1977).

**30.** *Id.* at 341, 554 F.2d at 2000. We noted in our opinion in *Hispanic I* that 29 U.S.C. § 655(b) does envision a situation where, once the Secretary has sought the recommendation of an advisory committee regarding a proposed standard, consideration of the standard moves through several statutory steps, each with a maximum time frame. The specific maxima within which action must taken are: advisory committee consideration, 270 days; publication of the recommended standard by the Secretary, 60 days; comments by interested parties, 30 days; specification of the time and place for a hearing, 30 days; promulgation of the standard or, alternatively, a determination that it shall not be issued, 60 days.

In *Hispanic I*, we held that this timetable was not mandatory. We noted that Congress had provided the Secretary "open-ended" discretion at several key points in the act, and we concluded:

> The Act has built in flexibilities that the Secretary may use, such as his right to initially determine whether or not there will be a standard; what the standard will be; the

priorities between the various occupations that may require standards; the altering and changing of those priorities even though once set; the forgiving of inaction where the Secretary makes a contemporaneous statement of reasons; the right to delay hearings; to process higher-priority standards more quickly than initiated ones; and, finally, the Secretary's right to refuse to adopt any standards even though the whole process has been exhausted. Despite all these admissions of discretion in the Secretary, El Congreso says that once the inexorable process is begun, it must grind on and on to its statutory end even though the Secretary has long before decided to refuse to adopt it. This makes an absurdity of the Act and a fool out of Congress. We cannot agree.

180 U.S.App.D.C. at 340, 554 F.2d at 1199. We concluded that, under the Act, the Secretary had "traditional agency discretion to alter priorities and defer action due to legitimate statutory considerations . . . ." 180 U.S.App. D.C. at 341, 554 F.2d at 1200.

**31.** *National Congress of Hispanic American Citizens v. Marshall* (Civil Action No. 2142–73, December 21, 1978). App. at 170.

**32.** 5 U.S.C. § 706(2)(A) (1977).

on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.[33]

Here, the Secretary, both in his initial presentation to the district court and in his later responses to interrogatories, has outlined the criteria which he used in setting his priorities.[34] He has explained at length how the application of those criteria produced the set of priorities he developed.[35] The criteria selected by the Secretary adequately reflect the purposes and provisions of the statute, and are rational within that context.[36] Though other relevant criteria could be imagined, and though even given the Secretary's criteria a different set of priorities could be developed, it is not the function of a reviewing court to substitute its judgment for that of the Secretary, where the Secretary has reasonably exercised his discretion. In our view, the Secretary has acted reasonably in this instance, and the district court developed "its own view of appropriate priorities for standards development"[37] and this was error.

The district court's "own view of appropriate priorities" disregarded, without warrant, material findings made by the agency.

For example, the Secretary specifically concluded that rulemaking concerning the field sanitation standard would be quite lengthy, involving the allocation of substantial resources (approximately 3600 man-hours). The Secretary also concluded that the greatest hazards to agricultural employees had already been remedied, and that other industries merited allocation of the available resources (the accident rate in the agricultural industry was fifth among eight major groupings). The district court emphasized almost exclusively the number of employees to be benefited, ignoring numerous other criteria considered by the Secretary such as the nature and the severity of the hazard exposure.

This court is of the view that greater respect is due the Secretary's judgment that promulgation of a cancer policy, a lead standard, an anhydrous amonia standard and the like, merited higher priority than a field sanitation standard. With its broader perspective, and access to a broad range of undertakings, and not merely the program before the court, the agency has a better capacity than the court to make the comparative judgments involved in determining priorities and allocating resources. The district court impermissibly substituted its judgment for that of the agency.

At another level, El Congreso indicts the Secretary's *modus operandi* in ap-

**33.** *Citizens to Preserve Overton Park v. Volpe*, 40 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970) (citations omitted).

**34.** *See* 200 U.S.App.D.C. pages 22–23, 626 F.2d pages 886–887, *supra.*

**35.** In response to an order by the district court after we remanded the case (*Hispanic I*), the Secretary filed a lengthy report detailing the basis of his priorities. App. at 39–57. Subsequently he also submitted answers to interrogatories propounded by El Congreso in which he discussed each priority standard and detailed the substances involved, the hazards presented and the need for regulation. Also included were estimates of the number of man-hours required for development of the standard, the costs of economic and technological feasibility studies, the numbers and titles of agency employees involved and the Secretary's standard setting budget. App. at 77–160.

The district court isolated a few of the standards accorded priority by the Secretary, and indicated disagreement with the Secretary in regard to them. *National Congress of Hispanic American Citizens v. Marshall* (Civil Action No. 2142–73, December 21, 1978). App. at 168–170. While such disagreement is certainly possible, it is not an adequate basis for finding the Secretary's application of the criteria irrational.

**36.** Giving priority to the most severe hazards, for example, comports with the Act's provisions for expedited rulemaking to deal with grave dangers. 29 U.S.C. § 655(c) (1977). The other criteria listed by the Secretary also find support in the statute. *See, e. g.,* 29 U.S.C. §§ 655(b)(1), 655(b)(5), 655(g), 656, 669, and 671 (1977).

**37.** *National Congress of Hispanic American Citizens v. Marshall* (Civil Action No. 2142–73, December 21, 1978). App. at 170.

proaching problems of occupational health and safety. It argues that "the Department is dissipating its energy by undertaking a myriad of entirely new ventures [in a] 'shot gun' approach [which] means that hundreds of standards are simultaneously 'being developed' but that few are ever finalized."[38] Such an approach, El Congreso argues, is so irrational a use of agency resources as to be an abuse of power. We cannot agree.

The Occupational Health and Safety Act represents an attempt by Congress to address wide-ranging, serious, and complicated problems. The Secretary already has promulgated standards addressing significant problems in a number of areas,[39] including some covering the most serious hazards in the agricultural industry.[40] The development of additional standards is proceeding. The Act clearly envisaged such a broad scope approach to the problem, with the informed discretion of the Secretary guiding decisions regarding the number of projects to be undertaken at one time. The 18-month plan submitted by the Secretary is a reasonable exercise of that discretion.

### B. *Did the Secretary Act in Good Faith?*

We have indicated here, as we did in our previous opinion, that any delay in the development of a standard beyond the time limits set in 29 U.S.C. § 655(b)(1)–(4) must be the result of a good faith ordering of priorities by the Secretary. In *Hispanic I* we acted "on the assumption that the Secretary [was] acting honestly and fairly in the selection of priorities, an assumption we

[adopted] since no claim [was] made to the contrary."[41] The district court did not say that the Secretary has not acted in good faith. Rather, the district court based its opinion on its perception that "the Secretary [had failed] to articulate rationally his rulemaking priority," a perception which led that court to invoke "its own view of appropriate priorities for standards development."[42]

The Secretary's claim of a good faith effort to discharge his statutory obligations is supported by the fact that he has already promulgated standards addressing many significant hazards, including standards regulating the most hazardous aspects of the agricultural industry.[43] In so doing, he has demonstrated a willingness to face strong political opposition by promulgating standards which were strenuously, even bitterly, opposed by those to be regulated. Nothing in the record would lead us to conclude at this time that the Secretary has been insincere in setting priorities or in presenting his timetable to the district court.

### C. *The Adequacy of the Secretary's Submission.*

Our opinion in *Hispanic I* made clear that the timetable of 29 U.S.C. § 655(b)(1)–(4) is not mandatory. But it also made clear that El Congreso was entitled to *some* timetable for the development of a field sanitation standard. Where the Secretary deems a problem significant enough to warrant initiation of the standard setting process, the Act requires that he have a plan to

---

**38.** Plaintiffs' Reply to the Secretary's Report Concerning OSHA's Standards in Agriculture. App. at 71.

**39.** *See, e. g.,* 43 Fed.Reg. 27962 (June 27, 1978, amending 43 Fed.Reg. 5918, Feb. 10, 1978) (benzene); 43 Fed.Reg. 19584 (May 5, 1978) (inorganic arsenic); 43 Fed.Reg. 52952 (Nov. 14, 1978) (lead); 43 Fed.Reg. 27350 (June 19, 1978); (cotton dust) as amended, 43 Fed.Reg. 28473 (June 30, 1978), 43 Red.Reg. 35032 (August 8, 1978), 43 Fed.Reg. 56893 (December 5, 1978); 43 Fed.Reg. 27418 (June 23, 1978) (cotton dust in cotton gins); 43 Fed.Reg. 11514 (March 17, 1978) (dibromochloropropane); 43 Fed.Reg. 45762 (Oct. 3, 1978) (acrylonitrile).

**40.** *See, e. g.,* 29 C.F.R. 1928.51 (1978) (tractor rollover protection); 29 C.F.R. 1928.57 (1978) (guarding of farm machinery); 29 C.F.R. 1928.-21(a)(5) (1978) (cotton dust in cotton gins).

**41.** *National Congress of Hispanic American Citizens v. Usery,* 180 U.S.App.D.C. 337, 341, 554 F.2d 1196, 1200 (1977).

**42.** *National Congress of Hispanic American Citizens v. Marshall* (Civil Action No. 2142–73, December 21, 1978). App. at 170.

**43.** *See* notes 39 and 40 *supra.*

shepherd through the development of the standard—that he take pains, regardless of the press of other priorities, to ensure that the standard is not inadvertently lost in the process.

It is not enough for the Secretary merely to state that the standard will not be issued over the next 18 months. If other priorities preclude promulgation of a field sanitation standard within that frame, then the Secretary must provide a timetable—at least for the standard in question—which covers a larger period.

Upon remand to the district court, the Secretary should be granted leeway to reconsider the timetable submitted on January 22, 1979, since it was developed without input from the official charged with responsibility for this area. In constructing the timetable, the Secretary need not be constrained, as he would have been under the district court order, to rearrange priorities that were rationally set. But, the Secretary must give due regard to the principle, presumed in the timetable of 29 U.S.C. § 655(b)(1)–(4) and developed here, that once the process of developing a standard begins, a good faith effort must be made to complete it.[44] It is for the district court to review the timetable submitted—not with regard to the Secretary's setting of priorities, which we have held in this instance to be a rational exercise of his discretionary powers, but with regard to the narrower concerns we have just delineated.

### III. CONCLUSION

The timetables of section 6(b)(1)–(4) of the Occupational Health and Safety Act, 29 U.S.C. § 655(b)(1)–(4) (1977), are not mandatory. The Secretary may delay development of a standard beyond the statutory timetables when, in good faith, he determines that other priorities demand an adjustment. Where delay is necessary, however, it is not enough for the Secretary,

having initiated the standard setting process, merely to state that the standard will not be developed within the period covered in his next planning period (here 18 months). Those seeking the protection of a standard are entitled to some assurance that its development has not been inadvertently side-tracked, and they are also entitled to a good faith representation from the Secretary regarding his reasonable expectation as to when the standard will be forthcoming.

Here the Secretary has acted within the bounds of his discretionary powers in setting the priorities for his department. There is no finding that he has acted in bad faith. The district court erred in substituting its judgment for that of the Secretary. But the Secretary did not adequately fulfill his duty to submit a timetable for the development of a field sanitation standard. Upon remand, the district court should require the Secretary to provide such a timetable in accordance with this opinion.

*So ordered.*

---

44. Our previous opinion did not require, and the timetable submitted by the Secretary as a result of this opinion will not require, that the Secretary commit himself irrevocably to developing a standard by a date certain, or within a given time frame. Intervening circumstances may require a readjustment of priorities and a concomitant modification of the timetable. Good faith adjustments of this sort are proper.