ACTION ON SMOKING AND HEALTH (ASH), Petitioner,

v.

DEPARTMENT OF LABOR, Occupational Safety and Health Administration, et al., Respondents.

No. 95–1615.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 1, 1996.

Decided Nov. 26, 1996.

John F. Banzhaf, III, argued the cause and filed the briefs, Washington, DC, for petitioner.

Charles F. James, Attorney, U.S. Department of Labor, argued the cause for respondents. With him on the brief were J. Davitt McAteer, Acting Solicitor of Labor, Joseph M. Woodward, Associate Solicitor, and Ann S. Rosenthal, Counsel.

Before: GINSBURG, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Petitioner is a charitable trust operating under the name of Action on Smoking and Health, or ASH. One year ago, it filed a petition for review of the Occupational Safety and Health Administration's failure to issue a

final rule regulating secondhand, or "environmental," tobacco smoke in the workplace. Another panel of this court, citing *Telecommunications Research & Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984), ordered ASH's filing to be treated as a petition for a writ of mandamus and referred it to us for decision. *See* D.C.Cir. Rule 21(a).

## I

■ When we heard the case, ASH's counsel confirmed that smoking was forbidden in ASH's offices. This raised doubts about ASH's claim that it had standing in its representative capacity. If ASH's employees were not encountering secondhand smoke in their offices, who was ASH purporting to represent? Organizations are sometimes able to sue on behalf of their members. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). But as a charitable trust, ASH did not fit the description of a traditional membership association. We wondered whether a trust's financial contributors should be treated as the equivalent of "members," so that the trust could appear for them and derive its standing from their injuries and need for redress. *Contrast American Legal Found. v. FCC,* 808 F.2d 84, 90 (D.C.Cir.1987).

ASH furnished post-argument affidavits at our request. Some are from ASH's donors. We do not rely on them, and thus do not decide the novel issue of derivative standing posed by a charitable trust. Another affidavit, submitted by the chairman of ASH's board of trustees, convinces us that ASH has standing on standard grounds. This gentleman has sworn that in his regular employment at the New York Mercantile Exchange, he is exposed to secondhand tobacco smoke and suffers from its effects. *See* 5 U.S.C. § 702. We have no doubt that ASH may act in a representative capacity for the members of its board of trustees, and may treat their interests as its own for the purposes of establishing its standing to sue when those interests "are germane to the organization's purpose," *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441. *Cf. Mountain States Legal Found. v. Costle,* 630 F.2d 754, 767–68 (10th Cir.1980).

The injury to the interests of one of its board members is therefore enough to allow ASH to proceed with the lawsuit. *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211–12, 45 L.Ed.2d 343 (1975); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 563, 112 S.Ct. 2130, 2137–38, 119 L.Ed.2d 351 (1992).

## II

■ For the last few years, ASH has been prodding the Administration into issuing a final rule regulating secondhand tobacco smoke as an occupational carcinogen. The history of some of these efforts is recounted in *Action on Smoking & Health v. Department of Labor,* 28 F.3d 162, 165 (D.C.Cir. 1994), in which we dismissed ASH's petition to require rulemaking because in April 1994, while the case was pending, the agency issued a Notice of Proposed Rulemaking on Indoor Air Quality dealing with contaminants including tobacco smoke. Among other restrictions in the proposed rule was a prohibition against smoking in all indoor workplaces except certain designated smoking areas with adequate ventilation systems. 59 Fed.Reg. 15,968, 16,037 (1994).

Public hearings on the proposal began in September 1994 and continued through March 1995. More than 400 witnesses testified. Because of the size and complexity of the record, an administrative law judge several times extended the deadline for filing post-hearing comments and replies. By the end of it, the Administration had amassed the largest record in its rulemaking history— more than 335,000 pages. ASH did not participate in the hearing.

The Administration has not yet issued or refused to issue a final rule, nor has it indicated when it would do so. From this ASH concludes that the agency is violating its regulatory timetable and that the court ought to step in and order compliance. At the center of ASH's case is the Administration's "Cancer Policy," 29 C.F.R. §§ 1990.101 to 1990.147. Adopted in January 1980, this Policy "establishes the criteria and procedures under which substances will be regulated by OSHA as potential occupational carcinogens." *Id.* § 1990.111(a).

With respect to timing, the Policy states: "Within one hundred twenty (120) days from the last day of any hearing or ninety (90) days from the close of any post hearing comment period, whichever occurs first, the [Administration] shall publish in the FEDERAL REGISTER" one of three things: (1) a "final standard based upon the record in the proceeding"; (2) a "statement that no final standard will be issued, and the reasons therefor"; or (3) a "statement that the [Administration] intends to issue a final rule, but that [it] is unable to do so at the present time." *Id.* § 1990.147(a). The Administration may exercise the third option "no more than" once, unless something on the order of newly discovered evidence is presented after the hearing. *Id.* § 1990.147(a)(3)(iii).

When we add 120 days to the last hearing day (March 1995), or 90 days to the last day for filing replies to comments (February 1996), we come up with dates long gone. The agency has offered several excuses for not bringing things to a close. Government shutdowns, budget cuts, a necessary reduction in staffing, uncertainty about future appropriations, a huge and complex record, technological problems in assessing the levels of tobacco smoke in different settings, the novelty of the proposed method of regulation, changing agency priorities—all have contributed to the delay. The Cancer Policy's "time frame for issuance of a final rule" is, the agency believes, "far too short to allow resolution of the complex scientific, technological and policy questions involved." Brief for the Secretary of Labor at 9. Compliance with the regulatory timetable would have been "not only impractical, but counterproductive in that it increases the risk that, upon further review, the rule will be remanded for further consideration and explanation." *Id.* at 10–11.

The short of the matter is that the Administration considers the Cancer Policy deadlines to be aspirational only. These deadlines, which have "never been met" in any of the Administration's rulemakings, reflect what the Administration views as an "optimistic policy goal rather than a realistically achievable schedule." *Id.* at 16. There is something to be said for the Administration's position. The statute the agency administers itself contains a seemingly strict timetable for rulemaking. *See* 29 U.S.C. § 655(b)(1)-(4). For instance, § 655(b)(4) provides that "[w]ithin sixty days after" completion of the rulemaking hearing, the Administration "shall issue a rule promulgating, modifying, or revoking an occupational safety or health standard or make a determination that a rule should not issue." Despite the "shall issue" language, two decisions of this court predating the Cancer Policy held that the statutory deadlines do not "circumscribe the discretion of the" Administration; that its "failure to act within their limits" is not, in itself, an abuse of discretion; and that the agency may rationally "delay development of a standard at any stage as priorities demand." *National Congress of Hispanic Am. Citizens (El Congreso) v. Marshall,* 626 F.2d 882, 888 (D.C.Cir.1979); *accord National Congress of Hispanic Am. Citizens v. Usery,* 554 F.2d 1196, 1199–1200 (D.C.Cir.1977).

It would be odd to suppose that the Cancer Policy regulations, promulgated only a few weeks after our *Hispanic II* decision, were meant to eliminate the sort of discretion we found implicit in § 655(b) of the statute. The Administration had just succeeded in convincing us that it needed leeway in setting priorities and that Congress could not have wanted courts to treat § 655(b)(1)-(4) as mandatory. *Hispanic II,* 626 F.2d at 890. One would expect new regulations setting timeframes to preserve the options our decisions had so recently given the agency. It is in that light that we read the following disclaimer in the Cancer Policy's Preamble: "The purpose of these timeframes is not to provide a legal basis to prevent or in any way delay promulgation of final standards. Rather, they are intended to provide specific targets for completion of the standard-setting process, so that any failure to comply or unreasonable delay will be made public." 45 Fed.Reg. 5002, 5212 (1980). This is followed by another disclaimer in the body of the regulations: "The failure of the Secretary to comply with the required timeframes shall not be a basis to set aside any standard or to require the issuance of a new proposal on any individual substance." 29 C.F.R. § 1990.147(b).

Neither of the statements just quoted speaks directly to the problem ASH has with the Administration. ASH does not want to have a standard "set aside." And it did not invoke the Cancer Policy to "delay promulgation of final standards." Just the opposite. Still, there is enough in the quoted material to indicate that the Administration issued the Cancer Policy merely to set goals for completing its work, much as we thought Congress did in § 655(b)(1)-(4). In *Hispanic I*, the main reason we gave for treating § 655(b) as nonmandatory stemmed from § 655(g), a provision giving the Administration considerable latitude to determine when, and in what areas, it should establish health and safety standards. 554 F.2d at 1198–1200. We said that if the Administration "may rationally order priorities and reallocate [its] resources at the point when [§ 655(b)(1) through (4)] becomes applicable," the Administration "should be able to do so at any rulemaking stage, so long as [its] discretion is honestly and fairly exercised." *Id.* at 1200. Since we construed the statutory deadlines in light of the broad delegation in § 655(g), we ought to do the same in construing the regulatory deadlines. The Cancer Policy itself echoes § 655(g): the agency's setting of priorities, "a complex matter which requires subjective and policy judgments," "is not intended to create any legal rights." 29 C.F.R. § 1990.132(a). We thus see no reason to treat the Cancer Policy's deadlines differently than those in the statute. If the latter are not mandatory

neither are the former. That is how the Administration interprets its regulation, and that is how the agency has gone about its rulemaking business.

Even if we were less sure about the nonmandatory nature of the Cancer Policy, our opinion in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C.Cir. 1984) [hereinafter *TRAC*],[1] would counsel against judicial intervention. Formulating a standard for indoor air quality remains "one of the Agency's highest priorities" and "[r]egulatory action to address the serious risks posed to America's workers by environmental tobacco smoke and unhealthful indoor air is now planned for fiscal year 1997." Statement of Regulatory Priorities, 60 Fed. Reg. 59,608, 59,609 (1995). Perhaps the Administration could have moved faster by drawing on additional resources. But then it would have threatened other items on its regulatory agenda.[2] *See In re Barr Labs.*, 930 F.2d 72, 75 (D.C.Cir.1991). Congress, in apparent recognition of the agency's budget squeeze, recently earmarked more funds to the Administration, upping the agency's fiscal year 1997 appropriations by seven percent. In the meantime, the Administration has not been twiddling its thumbs. *Cf. id.* The Administration told the court that it had just issued contracts for data processing services to help abstract and index the record, and that it expected to complete this project in eight months. If, as ASH tells us, much of the 335,000 pages consists of letters from smokers, not scientific information, the Ad-

**1.** *TRAC* gives this list of subjects to consider before a court decides to grant a mandamus petition on the ground of unreasonable agency delay:

(1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind

agency lassitude in order to hold that agency action is unreasonably delayed.

*Id.* at 80 (citations and internal quotations omitted).

**2.** In a January 30, 1996, memorandum, the Assistant Secretary for Occupational Safety and Health wrote that in light of government shutdowns, budget cuts, contingency funding, and future uncertainties, the Administration's priorities for the remainder of fiscal year 1996 included: "(1) Eliminating 1049 pages from the CFR; (2) Issuing final standards on abatement verification,1,3–butadiene, scaffolds in construction, methylene chloride, and respirators; (3) Issuing proposed standards on tuberculosis, steel erection and safety and health programs; [and] (4) Work[ing] with stakeholders to produce a proposed standard on confined spaces in construction."

ministration's task may not be as great as the volume of this material suggests. But we are not prepared to use ASH's mandamus petition as a basis for exercising judicial supervision over this aspect of the agency's work.

ASH criticizes the Administration for treating in one massive rulemaking not only tobacco smoke but many other indoor air quality contaminants "ranging from mold to chicken feathers." Reply Brief of Action on Smoking and Health at 8. ASH's point raises a policy question for the agency, not the courts. *See American Iron & Steel Inst. v. OSHA,* 939 F.2d 975, 982 (D.C.Cir.1991). The Administration has already given good, logical reasons for dealing broadly with the subject of indoor air pollutants. These contaminants potentially share the same control measures; rather than designating acceptable ventilation systems or other controls pollutant by pollutant, rulemaking by rulemaking, it makes sense to treat them together. As the Administration put it, "[c]omments submitted in response to the [Request For Information] indicated wide support for a regulatory approach that would focus on the design, operation and maintenance of building ventilation systems, source reduction methodology, and worker information and training programs." Notice of Proposed Rulemaking, 59 Fed.Reg. 15,968, 15,969 (1994).

For the foregoing reasons, the petition is denied.