**SIERRA CLUB, Petitioner,**

v.

**Anne M. GORSUCH, Administrator, Environmental Protection Agency, Respondent,**

**American Mining Congress, et al., Intervenors.**

No. 80–2218.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1982.

Decided Aug. 26, 1983.

As Amended Aug. 26 and Nov. 2, 1983.

Howard Fox, Washington, D.C., with whom Joseph J. Brecher, Oakland, Cal., was on brief, for petitioner.

Jesse Carrillo, Atty., Dept. of Justice, with whom Peter H. Wyckoff, Atty., E.P.A., Washington, D.C., was on brief, for respondent. Patrick J. Cafferty, Jr., Elizabeth Stein, Attys., Dept. of Justice, and Bruce M. Diamond, Atty., E.P.A., Washington, D.C., also entered appearances, for respondent.

Robert T. Connery, with whom Roberta L. Halladay and Paul D. Phillips, Denver, Colo., were on brief, for intervenors.

Before GINSBURG, Circuit Judge, BAZELON and MacKINNON, Senior Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

Dissenting opinion filed by Senior Circuit Judge MacKINNON.

BAZELON, Senior Circuit Judge:

Petitioner, Sierra Club, challenges the failure of the Environmental Protection Agency (EPA) to place strip mines on the list of pollutant sources subject to fugitive emissions regulations. EPA maintains that no decision has been made whether to include strip mines on the list and that the issue is still under study. EPA argues that until such decision is made, jurisdiction to review the dispute is lacking.[1] We find that jurisdiction does exist, but that the record is inadequate for our review. We

therefore remand to the agency for supplementation of the record.

## BACKGROUND

The Clean Air Act (Act)[2] established minimum air quality standards to be achieved in all regions of the country. Prior to 1977, however, the Act contained no explicit provision to prevent areas where air quality exceeded the statutory minimum from degenerating to that level. In 1974, following *Sierra Club v. Ruckelshaus*,[3] EPA promulgated regulations establishing a program for "prevention of significant deterioration" (PSD) to prevent such degeneration. In 1977, Congress amended the Act to incorporate a PSD program into the structure of the Act.[4]

In areas where PSD provisions apply, major new sources of pollution may not be built without first obtaining a permit from the state in which the source will be located.[5] Permits may be issued only to sources that satisfy two principal requirements. First, the owner or operator of the source must demonstrate that emissions from construction or operation of the source will not violate any applicable emissions standard of the Act.[6] Second, the proposed source must be subject to the best available pollution control technology.[7]

The PSD provisions of the Act only apply to "major emitting facilities."[8] The Act's definition of that term encompasses sources

---

1. Several parties have intervened in support of EPA's position: American Mining Congress, AMAX Inc., AMSELCO Minerals Inc., ASARCO Incorporated, Cyprus Mines Corporation, Colorado Yampa Coal Company, Freeport Gold Company, Stillwater PGM Resources, Peter Kiewit Sons, Inc., Phelps-Dodge Corporation, and Phillips Uranium Corporation.

2. Pub.L. 95–95, 91 Stat. 685 (codified as amended at 42 U.S.C. §§ 7401–7642 (Supp. V 1981)).

3. 344 F.Supp. 253 (D.D.C.1972), *aff'd by an equally divided court sub nom. Fri v. Sierra Club*, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973).

4. Pub.L. 95–95, Title I, § 127(a), 91 Stat. 731 (codified as amended at 42 U.S.C. §§ 7470–7479 (Supp. V 1981)).

5. Act § 165, 42 U.S.C. § 7475 (Supp. V 1981). Although the permits are issued by the states, the application process allows for significant federal involvement in permit decisions. *See id.*

6. *Id.* § 165(a)(3), 42 U.S.C. § 7475(a)(3) (Supp. V 1981).

7. *Id.* § 165(a)(4), 42 U.S.C. § 7475(a)(4) (Supp. V 1981).

8. *Id.* § 165(a), 42 U.S.C. § 7475(a) (Supp. V 1981).

in twenty-eight industrial categories that have the potential to emit 100 tons per year of any regulated pollutant, or any other source with the potential to emit 250 tons or more per year of any such pollutant.[9] For purposes of calculating potential emissions, the Act distinguishes between two types of emissions: "point source" emissions, such as those from a chimney; and "fugitive" emissions, which are not emitted from a single point.[10]

Prior to *Alabama Power Co. v. Costle*,[11] EPA's PSD regulations considered all emissions from a source for purposes of determining whether it qualified as a major emitting facility under the Act. In *Alabama Power,* this court held that the agency could only consider fugitive emissions in such determinations when done pursuant to a rule.[12] The court remanded to the agency for further consideration.

On remand, EPA proposed revised PSD regulations. The proposal included a list of

twenty-seven categories [13] of sources whose fugitive emissions would be taken into account in determining whether a source is a major emitting facility and thus required to meet all requirements for a construction permit from EPA. Strip mines were not among the categories listed. The agency explained, however, that exclusion from the list was not a final decision:

> EPA is focusing first on the sources listed above because its experience in quantifying the "fugitive emissions" from such sources is, in general, greater than its experience in quantifying such emissions from other sources. The Administrator over the next several months will consider the need for additional source types to be added to the list beyond those which would be newly regulated ... *including strip mines.*[14]

Sierra Club strongly urged that strip mines be included on the final list.[15] Its

---

9. *Id.* § 169, 42 U.S.C. § 7479 (Supp. V 1981).

10. *See* 40 C.F.R. § 51.24(b)(2)(20) (1982) ("'Fugitive emissions' means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.").

11. 636 F.2d 323 (D.C.Cir.1979).

12. *Id.* at 368–70. Prior to *Alabama Power,* EPA had assumed that there was no difference between fugitive emissions and point sources for purposes of determining whether a source was a major emitting facility under § 169(1) and thus subject to § 165. This assumption made many sources subject to regulation even though the vast majority of their emissions were fugitive in nature, including fugitive dust. Because some source categories—mainly in the mining and forestry industries—would have found meeting such standards almost impossible, EPA promulgated a partial exemption for fugitive dust.

In *Alabama Power,* this court invalidated the partial exemption because it had no statutory basis. *Id.* at 370. However, the court found that the definition of "major emitting facility" in § 169(1) had not entirely supplanted the general definition of that term found in § 302(j) of the Act, 42 U.S.C. § 7602(j) (Supp. V 1981), which defines the term as

> any stationary facility or source of air pollutants which directly emits, or has the poten-

tial to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator).

The court held that § 302(j) specifically attaches a rulemaking requirement for the inclusion of fugitive emissions in the threshold calculation of whether a source is a major emitting facility. The court further outlined an interpretation of the statute that enables EPA to accomplish the objective of a partial exemption through rulemaking under § 111, 42 U.S.C. § 7411 (Supp. V 1981). 636 F.2d at 370 n. 134.

13. Sierra Club contends that the list only consists of twenty-six categories. The discrepancy exists because EPA includes a final category which is "any other stationary source category which, at the time of the applicability determination, is being regulated under § 111 or § 112 of the Act." 40 C.F.R. § 51.24(i)(4)(ii)(*aa*) (1982).

14. 44 Fed.Reg. 51,931 (1979) (emphasis added) (citation omitted).

15. COMMENTS ON "PROPOSED RULES: REQUIREMENTS FOR PREPARATION, ADOPTION AND SUBMITTAL OF SIP'S; OF IMPLEMENTATION PLANS," 44 Fed.Reg. 51,924 (1979) (submitted by Sierra Club Legal Defense Fund, Inc., Nov. 5, 1979) (hereinafter referred to as COMMENTS ON "PROPOSED RULES").

testimony cited the "PEDCo report,"[16] an EPA-commissioned study that calculated the emission levels of various strip mine operations. Sierra Club concluded from data in that study that even a small mine producing only one million tons of coal per year would generate fugitive emissions of 1750 tons per year[17] and that between 10% and 15% of those emissions (175 to 262 tons) would be in the dangerous, respirable 10 micron-or-less size range.[18] Thus, many small mines and certainly larger mines would satisfy the 250 tons per year requirement, making them eligible for PSD regulation under the Act.

On August 7, 1980, EPA promulgated the revised PSD regulations in final form.[19] Strip mines were not included. The agency indicated that its greater experience in quantifying fugitive emissions from the listed sources was the reason that they had been included at that stage.[20]

On November 25, 1980, Sierra Club petitioned EPA for reconsideration of the regulations on the ground that the agency had improperly omitted strip mines from the list. On March 2, 1981, the agency denied the petition. In the agency's response, the administrator explained that the absence of strip mines from the final list "did not mean that the agency had concluded its review of the strip mine question and had decided" not to include strip mines as a source on the list. Instead, the administrator said that the agency was "actively gathering information ... [to] put it in a better position than it is now to reach a final decision on strip mines."

That information-gathering process continues. In the meantime fugitive emissions from new strip mines are not included for purposes of determining whether the mine will result in violation of air quality standards.

On October 6, 1980, Sierra Club petitioned this court for review. The case was consolidated with several others filed by industry petitioners challenging other aspects of PSD regulation.[21] Briefing of the issues was stayed while settlement negotiations on some of the issues—but not the instant question—were conducted. On February 8, 1982, EPA moved to dismiss Sierra Club's petition for review on the ground that EPA had not yet taken final action on whether to include strip mines in the PSD regulations. This court then severed Sierra Club's petition for review from the consolidated cases and referred EPA's motion to dismiss to the merits panel.

ANALYSIS

A. *Jurisdiction*

Section 307(b)(1) of the Act[22] vests jurisdiction in this court to review "final action" of the administrator, and action of the administrator concerning "nationally applicable regulations." Although the Act does not define the terms "action" or "final action," both terms have traditional meanings in the administrative context. The Admin-

---

16. EPA Report No. 908–1–78–003, *Survey of Fugitive Dust from Coal Mines* (1978).

17. *Id.* at 65.

18. *Id.* at 56. Sierra Club offers no support in its brief for its statement that 10 micron-or-less sized particles are "respirable" and "dangerous." In COMMENTS ON "PROPOSED RULES," *supra* note 16, however, it supports this position by citing to the EPA brief in *Alabama Power.* Brief for Respondents at 136–37, *Alabama Power v. Costle,* 636 F.2d 323 (D.C.Cir.1979).

EPA does not rebut this aspect of Sierra Club's position. At least for present purposes, we therefore assume it to be undisputed.

19. 45 Fed.Reg. 52,676 (1980).

20. *Id.* at 52,691.

21. *Chemical Manufacturers Association v. EPA,* No. 79–1112 and consolidated cases.

22. 42 U.S.C. § 7607(b)(1) (Supp. V 1981).

istrative Procedure Act (APA)[23] defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act . . . ."[24] The requirement of finality is in essence a question of ripeness, focusing on the appropriateness of the issues presented for judicial review. Courts have approached this determination in a pragmatic way, considering "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."[25]

In the instant case, jurisdiction over Sierra Club's claim exists because its petition challenges EPA's list of sources *as promulgated.* The inclusion of strip mines was clearly an issue in that rulemaking, as strip mines had been regulated by the PSD regulations invalidated by *Alabama Power,*[26] and Sierra Club had submitted comments on the issue. The regulations under challenge became final the date they were pub-

lished in the Federal Register, and review of the regulation was appropriate any time thereafter.[27] Indeed, the judicial review provisions of the Act would seem to suggest that review had to be sought immediately, if at all.[28]

The source of our jurisdiction does, however, narrow the focus of the issue presented. At issue is only the validity of EPA's promulgated rule, not the independent necessity of future rules that EPA might promulgate concerning strip mines. EPA confuses this point when it contends that judicial review is inappropriate for lack of agency final action. We are not deciding whether regulations covering strip mines would have been required in the absence of an ongoing proceeding. Sierra Club's position, as best we can piece it together, is that given the agency's criteria for placing a category of sources on the August 7, 1980, list, strip mines should have been included.[29]

---

**23.** 5 U.S.C. §§ 551–559, 701–6, 1305, 3105, 3344, 7521 (1982).

**24.** 4 U.S.C. § 551(3) (1976 & Supp. V 1981). §§ 553–557 and § 706 of Title 5 (the Administrative Procedure Act) do not apply to judicial review of EPA rulemaking. Act § 307(d)(1), 42 U.S.C. § 7607(d)(1) (Supp. V 1981). We do not decide the significance of the APA definition of agency action in § 551(3), but it is clear that the promulgation of a final rule constitutes agency action under § 307(b)(1) of the Act. *See Duquesne Light Co. v. EPA,* 698 F.2d 456 (D.C.Cir.1983).

**25.** *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

**26.** *See* 43 Fed.Reg. 26,395 (1978).

**27.** Act § 307(b)(1), 42 U.S.C. § 7607(b)(1) (Supp. V 1981).

**28.** *Id.* This provision reads, in part:
Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise.
The evidence relied on by Sierra Club in this challenge was all in existence at the time of promulgation of the EPA regulation. We do

not make any conclusions regarding the effect the quoted language would have had on a challenge by Sierra Club after the 60-day period had passed, but we note that immediate challenge is the prudent course given the language of § 307(b)(1).

**29.** Two related issues raised by Sierra Club are not properly before us, and we make no conclusion concerning their merits. First, Sierra Club maintains that a final EPA decision to exclude from regulation fugitive emissions from strip mines would violate the intent of Congress. This issue is not before us because EPA has not yet decided whether it will regulate strip mines. Until such decision has been made, the issue is not ripe for review. We therefore give no opinion on whether the Act requires EPA to regulate strip mines, except to note that *Alabama Power,* 636 F.2d 368–70, held that any such regulation had to be through rulemaking.

Second, Sierra Club argues that we should treat the delay in EPA deliberations on strip mines as equivalent to a decision not to regulate and subject to review as such. In its reply brief, however, Sierra Club takes the position that it has no evidence on strip mines to place before the agency that was not before the agency in the original rulemaking. Reply Brief at 11–12. In short, the essence of Sierra Club's position is not that the "multi-stage, multi-year study" that EPA has undertaken is going too slowly, but that it is unnecessary for a decision whether to place strip mines on the list. This issue collapses, therefore, into the question that we do review: whether the omission of strip

The scope of our jurisdiction is fully adequate to consider that claim.

## B. Scope of Review

The scope of our review is set forth in section 307(d) of the Act,[30] the rulemaking provision under which EPA promulgated the regulations. Section 307(d)(9) authorizes a reviewing court to reverse action by the Administrator found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The court is aided in its review by section 307(d)(6)(B), which requires that a rule promulgated by EPA "be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period."[31] The purpose of this provision is to enable a reviewing court and the parties to see the factual and decisional framework underlying the agency's action. The responses should explain how the agency resolved any significant issues raised by the comments and show how that resolution led to the ultimate rule.[32]

It has frequently been recognized that application of the "arbitrary and capricious" standard requires reviewing courts to adjust their inquiry according to the particular agency action under review.[33] Such adjustment depends on a variety of factors, many of which reflect limits of judicial competence that counsel give greater deference to some agency decisions than others. Where an agency has been given wide discretion, the nature of judicial review will perforce be narrower than when an explicit statutory mandate exists. Likewise, the agency expertise required by a decision will also affect the standard against which courts review agency action. Such a flexible approach creates difficulty articulating with precision the standard of review, but a more rigid approach is untenable given the wide range of actions subject to review under this single standard.[34]

Although EPA's position—that final action has not been taken—does not affect our jurisdiction, it does affect our standard of review. Absent a precise statutory timetable[35] or other factors counseling expeditious action,[36] an agency's control over the timetable of a rulemaking proceeding is entitled to considerable deference. Such deference derives from an agency's discretion to set its own priorities, which may reflect a variety of factors outside the focus of a

mines from the August 7, 1980, list was arbitrary and capricious. If Sierra Club feels that new evidence on strip mines has developed since promulgation of the list, the proper action is for it to submit the evidence to EPA along with a petition for rulemaking.

30. 42 U.S.C. § 7607(d) (Supp. V 1981).

31. Congress added this section to the Act in the Clean Air Act Amendments of 1977, Pub.L. 95–95, 91 Stat. 685 (codified at scattered sections of 42 U.S.C.). In doing so, Congress gave clearer statutory support for a standard of review that courts had for many years found implicit in the right of the public to comment on proposed rules, coupled with the requirement that an agency provide a statement of basis and purpose. 5 U.S.C. § 553(c) (1976). See National Lime Ass'n v. EPA, 627 F.2d 416, 452–53 (D.C.Cir.1980); H.R.Conf.Rep. No. 564, 95th Cong., 1st Sess. 178 (1977), reprinted in 1977 U.S.Code Cong. & Admin.News 1077, 1559.

32. Cf. Action on Smoking and Health v. CAB, 699 F.2d 1209 (D.C.Cir.1983) (applying APA).

33. Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1049–50 (D.C.Cir.1979) (applying APA).

34. Id. at 1050.

35. Even where a statutory timetable exists, noncompliance with it has sometimes been excused as long as the agency has acted rationally and in good faith. See, e.g., National Congress of Hispanic American Citizens v. Usery, 554 F.2d 1196 (D.C.Cir.1977).

36. See Public Citizen v. Auchter, 702 F.2d 1150 (D.C.Cir.1983) ("delays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake"); Environmental Defense Fund v. Hardin, 428 F.2d 1093 (D.C.Cir.1970) (agency had less discretion to control decisional timetable on interim suspension of DDT where "imminent hazard" was at stake than it did in the proceeding considering the appropriate long-term action).

rulemaking.[37] For this reason, our review of delayed action in rulemaking is of necessity limited to examining an agency's reasons for deferred action and determining whether that delay is inconsistent with the agency's discretion under the applicable statutory scheme.[38] That review must be undertaken vigorously, however, for it must enable reviewing courts to evaluate claims—like the one made by petitioner here—that an agency is preventing review of a decision not to regulate by indefinitely insisting that final action has been deferred.[39] Judicial review of decisions not to regulate must not be frustrated by *blind* acceptance of an agency's claim that a decision is still under study.[40]

### C. *The August 7, 1980 Regulation*

Sierra Club's argument that strip mines must be included on the list of regulated sources relies heavily on findings of the PEDCo report. Those findings suggest that many small strip mines—and presumably all larger ones—produce enough pollutants to satisfy the Act's 250-ton threshold requirement. If the report is correct, the inclusion of strip mines would seem mandated by EPA's policy statement accompanying the proposed list, which stated that

> EPA believes that there is no reason why a source of a particular pollutant regulated under the Act should escape review

because the emissions of the pollutant are fugitive, when a source of the same pollutant has to get a permit if the emissions are not fugitive. In both cases, the emissions would deteriorate air quality regardless of how they emanate.[41]

EPA defends the omission of strip mines by arguing that it lacks quantification techniques for applying PSD regulations to individual mines. In promulgating the final list, EPA explained that it was focusing first on the sources listed because its experience in quantifying fugitive emissions from them is, in general, greater than its experience in doing so for other sources.[42] EPA uses this rationale as justification for the "multi-year, multi-stage" set of studies in which it is currently engaged.

As Sierra Club points out, however, this justification seems to contradict the agency's reasoning used to defend the *inclusion* of several other sources on the list. When EPA proposed the list, it received strong criticism from industry claiming that it should not have listed certain sources because "fugitive emissions data were either unavailable or inadequate." In response, the agency asserted that precise quantification was necessary only to determine whether a *particular source* was subject to review, not to determine whether a *category* of sources should be regulated:

> and had it appeared then that further action on strip mines was forthcoming shortly, the standard of our review would have been less exacting. Indeed, had the agency explicitly extended the rulemaking on strip mines, questions of ripeness might have affected our jurisdiction. In short, the agency's control over the timetable of rulemaking is entitled to considerable deference that can affect both the ripeness of an issue for review, and the scope of any such review. As a general matter, however, such deference diminishes with the passage of time.

---

37. See *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1056 (D.C.Cir.1979) (the agency "alone is cognizant of the many demands on it, its limited resources, and the most effective structuring and timing of proceedings to resolve those competing demands"); *National Congress of Hispanic American Citizens v. Usery,* 554 F.2d 1196, 1200 (D.C.Cir.1977) (agency has "traditional agency discretion to alter priorities and defer action due to legitimate statutory considerations...").

38. *Public Citizen v. Auchter,* 702 F.2d 1150 (D.C.Cir.1983) ("reasonableness of delay must be judged" in the context of the statute which authorizes the agency's action).

39. The subject of this review is the validity of the August 7, 1980 list. This is not to say that the slow pace of EPA's further consideration of strip mines is irrelevant. Had this case been decided shortly after promulgation of the list,

40. See *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 F.2d 584, 593 (D.C.Cir.1971) (if court has jurisdiction to review agency denial of a petition, agency cannot escape review by delaying its determination indefinitely).

41. 44 Fed.Reg. 51,931 (1979).

42. 45 Fed.Reg. 52,692 (1980).

On the issue of the appropriateness of including fugitive emissions in threshold calculations for particular categories of sources, the basic objection expressed by most commenters was that fugitive emissions data were either unavailable or inadequate, and that it would therefore be inappropriate to include fugitive emissions in threshold calculations for a particular category.

In response, *EPA notes that such concerns should and will be addressed in the context of particular applicability determinations, but that they have not changed the basic policy decision made by the Administrator under section 302(j). As explained earlier, fugitive emissions must be taken into account under section 165 in determining the impact of ambient air quality of a proposed new source and the [best available control technology] requirements which will apply to it, even if there are no existing fugitive emissions data, or if the available data are crude.* Obviously, the nature and extent of the available data and technologies are important factors in determining how fugitive emissions should be taken into account and how they should be regulated under the review and permitting process of section 165; but those factors will not avoid or eliminate the consideration of fugitive emissions under that process. *Similarly, although the issue of quantification may be relevant to particular applicability determinations, EPA does not believe that that issue alone is critical in determining whether, as a general policy matter, it is appropriate to include fugitive emissions in threshold calculations for a particular category of sources.*[43]

Sierra Club argues that this language, combined with the implications of the PEDCo report, demonstrate that EPA has arbitrarily treated similar quantification problems differently.

EPA responds that the rationale expressed in the quoted language applies only to the categories of source actually chosen for listing. In short, the agency implies that although precise quantification is not necessary for some sources, it is necessary for others. EPA does not, however, offer any explanation for why this is so. The reasons underlying such a distinction certainly are not self-evident.

■ In sum, the picture on review is as follows. EPA has stated its intention to regulate all facilities that emit 250 tons per year of a regulated pollutant, regardless of whether the emissions are point source or fugitive. According to Sierra Club, the PEDCo report—a study commissioned by EPA—suggests that most strip mines emit the 250-ton threshold amount. Neither the agency nor industry intervenors[44] have given reasons to discount Sierra Club's interpretation of the PEDCo report. In fact, the statement accompanying the final regulations contains no reference to the PEDCo report at all, despite Sierra Club's reliance on it in comments. Furthermore, the agency has not retreated from its position that all sources meeting the 250-ton threshold requirement should be regulated. Yet, EPA has thus far declined to regulate strip mines. If there is reasoned decisionmaking lurking behind such agency behavior, it is yet to be articulated. For agency action to be upheld, it must not only be explainable;

43. 45 Fed.Reg. at 52,692 (1980) (emphasis added).

44. Industry intervenors suggest that Sierra Club "fundamentally misinterprets the PEDCo report" because that report states at page 8:

Health effects research data clearly indicate that adverse effects are associated with respirable particles rather than the large particles which fall out within a short distance of the source.

In addition, intervenors argue that the PEDCo study also established that mining operations produce very few particles in the respirable size range. Neither of these points made by intervenors contradicts Sierra Club's interpretation of the PEDCo report. Sierra Club agrees that only respirable particles are harmful and that strip mine emissions consist mainly of larger particles. Sierra Club's argument, however, is that 10%–15% of strip mine emissions are respirable and that, in many cases, that percentage exceeds 250 tons annually.

it must also be explained.[45] Without such explanation, we cannot properly exercise review.

EPA's insistence that no final decision has been made provides little comfort. When EPA first proposed regulations governing fugitive emissions and did not place strip mines on the list of regulated sources, the agency indicated that "over the next several months, [the Administrator] will consider the need for additional source types to be added to the list beyond those that will be newly regulated . . . including strip mines."[46] Final regulations were promulgated eleven months later, and no explicit action on strip mines had yet been taken. The agency offered no discussion of the evidence submitted concerning strip mines, and rulemaking on the issue was not extended. The rulemaking proceeding in which strip mines had been in issue officially ended at that time. It is the omission of strip mines from the list promulgated in that proceeding that we have considered and found troubling.

Although the record before us is inadequate to support EPA's action, we cannot say at this point that the agency has acted arbitrarily or capriciously. We therefore remand the record to EPA and, in the interest of judicial economy, the panel retains jurisdiction. On remand, the agency is to reconsider whether strip mines should be added to the list of regulated sources. We expect EPA to give explicit consideration to the PEDCo report and to consider whether it forms a sufficient basis for including strip mines on the list of sources subject to regulation. If EPA decides not to regulate strip mines at the present time, relying in part upon quantification difficulties, it should clarify the role of quantification techniques in the decision to include a category of sources on the list. Finally, we trust that the agency will act on this remand in an appropriately expeditious manner.[47]

*So ordered.*

MacKINNON, Senior Circuit Judge, dissenting:

I agree with the statement in the majority opinion that "we cannot say at this point that the agency has acted arbitrarily or capriciously." Maj. Op. at 661. Implicit in that determination is the fact that the agency has not taken final action on strip mines. I thus find under section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1),[1] that this court lacks jurisdiction because there is no final action for this court to review. The Administrator has not promulgated any national regulation or taken any "final action" under the Act with respect to strip mines.

The contention by appellant that this court should review the situation because it includes an alleged decision *not* to regulate strip mines is based on an incorrect fact, but in any event the cause is obviously not ripe for review. There is absolutely nothing in the record to support a statement that the Administrator has made any such decision. Neither does the record indicate that the Administrator has unreasonably delayed rule making with regard to strip mines. Without any "final action" in the matter, and an unripe record, this court is without jurisdiction. This is another case where petitioners have jumped the gun again. *See Kleppe v. Sierra Club,* 427 U.S.

45. *Environmental Defense Fund, Inc. v. EPA,* 465 F.2d 528, 539 (D.C.Cir.1972).

46. 44 Fed.Reg. 51,931 (1979).

47. Absent cause shown, we anticipate final action by the agency pursuant to the remand within ninety days.

1. The Clean Air Act, 42 U.S.C. § 7607(b)(1), provides:

A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard . . . or any *other nationally applicable regulations* promulgated, or final action taken, by the Administrator under this Act may be filed *only in the United States Court of Appeals for the District of Columbia. . . .* Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register . . . . (Emphasis added).

390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), *reversing and remanding Sierra Club v. Morton,* 514 F.2d 856 (D.C.Cir.1975). Petitioners' impatience with agency action cannot confer jurisdiction. The variations in the location, character and operation of strip mines throughout the United States and the number of such mines is so great that it is very reasonable for the EPA to require complete data before it embarks on imposing controls and regulations in what is essentially a new field, *i.e.,* the nationwide regulation of the emission of dust (fugitive emissions) from strip mines. The EPA is to be commended for not acting arbitrarily and capriciously and for not proceeding on incomplete and inadequate information.

I would accordingly dismiss the petition for review. When the EPA makes a final decision in the matter, if petitioners are dissatisfied, they can bring the matter before the court in the proper manner as a separate case. *There is absolutely no justification whatsoever for this panel to reach out to acquire jurisdiction of whatever case, if any, may subsequently arise on the merits with respect to the regulation of fugitive emissions from strip mines.* The consideration we have given to this case has been devoted primarily to *procedural* issues and that does not justify the continuation of jurisdiction in the panel. If ever another appeal eventuates, it will be from some final action of the Administrator that will undoubtedly include some regulations and a relevant record. If petitioners then have no complaint against those regulations or the action of the Administrator, there should not be any appeal. And if they do it will be essentially a different case with a different record on substantially different issues than what is presently before us. Regardless of how much the majority might like to exercise judicial jurisdiction in that case, nothing they have done in this case justifies their assignment of that case to themselves on a record that would undoubtedly present far different facts and issues. Thus, in the interim we should not carry this case on our pending docket. I thus respectfully dissent to the extent above stated from the panel's refusal to dismiss

the appeal and from their unsupportable assumption of the right to exercise jurisdiction of any case that might subsequently develop for determination on the merits. The court, regardless of the action it takes, should *not* remand the record, but should couch its decision in a *final judgment* on the case that is before us. I thus respectfully dissent to the extent above stated.