# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 9, 2006      Decided January 19, 2007

No. 05-5471

MARTIN J. GILLAN, IV,
APPELLANT

v.

DONALD C. WINTER, SECRETARY OF THE NAVY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 04cv00311)

———

*Eugene R. Fidell* argued the cause for appellant. With him on the briefs was *Matthew S. Freedus*.

*W. Mark Nebeker*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Michael J. Ryan*, Assistant U.S. Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: HENDERSON, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Appellant Martin Gillan, IV was discharged from the United States Naval Reserve because he was twice passed over for promotion while classified as an active reservist. Gillan has challenged his discharge on the ground that the Navy should not even have considered him for a promotion and only did so because it had improperly failed to transfer him to an inactive status. He brought his claim first to the Navy's Board for Correction of Naval Records ("BCNR"), where he lost. He next sought review of the Navy's decision in federal district court, which granted summary judgment against him. We affirm the district court's judgment because we find that 10 U.S.C. § 12642, the statute that governs how the Navy classifies and evaluates reservists, does not provide a specific time frame in which the Navy must transfer qualified reservists to inactive status.

## I.

A Naval Reservist's pay, benefits, and eligibility for promotion turn on both his status as either an active or inactive reservist and the category of service in which he is classified. Reservists in an active status can be paid, are eligible to train, earn retirement points, and be considered for promotion. BUREAU OF NAVAL PERSONNEL INSTRUCTION 1001.39A § 102(1) (1992). Inactive reservists cannot be paid, participate in training, earn retirement points, or be considered for promotion. *Id.* § 102(2). There are three categories of service for reservists: Ready Reserve, Standby Reserve, and Retired Reserve. *Id.* § 101. The Ready Reserve is further divided into the Selected Reserve and the Individual Ready Reserve, both of which are active status. *Id.* § 102(1). There are two subcategories of Standby Reservists: Standby Reserve Active and Standby Reserve Inactive. *Id.* § 103(2). As the names indicate, the former is an active status category, the latter an inactive status.

Retired Reservists must have met the requirements for a military pension and may not earn more retirement points or be promoted. *Id.* § 102(3). Whether Gillan should have been considered for promotion turns on whether he was properly classified in an active status in the Ready Reserve or in an inactive status in the Standby Reserve Inactive.

Congress has directed the Navy to prescribe "equitable procedures for the periodic determination" of whether reservists meet the standards and qualifications for their status. 10 U.S.C. § 12641; *see also* 10 U.S.C. § 10149 (directing the military to provide a "system of continuous screening of units and members of the Ready Reserve"). Department of Defense and Navy regulations require that the Navy conduct an annual screening to make this determination. *See* 32 C.F.R. § 44.5(c)(1) ("Screen, at least annually, all Ready Reservists under their jurisdiction to ensure their immediate availability for active duty [] and to ensure compliance with 10 U.S.C. 10149."); BUREAU OF NAVAL PERSONNEL INSTRUCTION 1001.39A § 2102 (1992) (requiring that "[a]ll members of the Ready Reserve who are not on active duty will be screened at least annually"). If a reserve commissioned officer fails to meet the requirements of active status, the Navy "shall": (1) transfer him to the Retired Reserve if qualified; (2) transfer him to inactive status if qualified; or (3) discharge him from his reserve appointment. 10 U.S.C. § 12642. Notably, although Congress requires the transfer of delinquent active reservists, the statute says nothing about when that must happen.

Gillan was commissioned as a Coast Guard officer in 1978 and served on active duty as an aviator until he was honorably discharged in 1985 at the rank of Lieutenant. He served in the Coast Guard Individual Ready Reserve from May 1985 until October 1987. Gillan then transferred to the Naval Reserve in late 1987 as a member of the Ready Reserve and was

promoted to Lieutenant Commander in 1990. In December 1990, Gillan was activated for service in Operation Desert Storm. After hostilities ceased and effective May 31, 1991, he transferred to the Individual Ready Reserve in an active status. At the time of this transfer, the Navy told Gillan that,

> If you desire a category of lesser participation in the Naval Reserve, you may wish to request a transfer to the Standby Reserve, Inactive. In that category, you will not be allowed to participate except in time of war and would not be eligible for promotion until one year after your return to the Ready Reserve.

Letter from Commanding Officer, Naval Air Reserve San Diego, to Martin J. Gillan (June 12, 1991). Gillan never responded to this invitation. He failed to seek a transfer to the Standby Reserve Inactive. In fact, Gillan had no communication with and did not participate in the Naval Reserves in any capacity for the next six years because of "pressing family reasons" and his "civilian employment as a junior airline pilot." Appellant's Br. at 5.

As a member of the Individual Ready Reserve, Gillan was required, through participation and training, to earn "27 points . . . each anniversary year" to remain in an active status. BUREAU OF NAVAL PERSONNEL INSTRUCTION 1001.39A § 104(1)(1992). His complete failure to fulfill any of his reserve duties from the time of his transfer to the Individual Ready Reserve on March 31, 1991, made him subject to review by an entity called the Mobilization Disposition Board ("MDB"). The MDB determines whether a reservist will be transferred pursuant to guidelines created by Congress in 10 U.S.C. § 12642. In Gillan's case, the MDB ultimately had two options in the face of his total failure to participate in any of his reserve duties: transfer

him from active status as a member of the Individual Ready Reserve to inactive status in the Standby Reserve Inactive or, in the alternative, discharge him from the Naval Reserve altogether. 10 U.S.C. § 12642(b). Gillan's case was not considered by the January 1993 MDB because the files for that MDB were collected in July 1992, before the Navy had any record of his noncompliance. Letter from Chairman, Board for Correction of Naval Records, to Secretary of Navy 2-3 (Dec. 15, 2003) ("BCNR Decision"). Gillan was also not considered by the August 1994 MDB. The BCNR noted in its final decision that the Navy normally notified reservists whose records would be screened by the MDB and "those who did not respond to their notification letter were placed on a list to go to the next scheduled board." *Id.* at 3. This notification letter is intended to provide delinquent active reservists a chance to respond to a possible change in reserve status that affects their pay and retirement benefits. The BCNR thus believed that because Gillan admitted that he had "zero contact" with the Navy in 1994, his failure to respond to the Navy's presumed notification pushed the review of his record past the 1994 MDB to the next MDB in August 1995. That MDB did consider Gillan's record of non-compliance and transferred him to an inactive status in the Standby Reserve Inactive. *Id.*

While Gillan was still in an active status as a member of the Ready Reserve from May 1991 until the August 1995 MDB decision, he was eligible for promotion. BUREAU OF NAVAL PERSONNEL INSTRUCTION 1001.39A § 102(1) (1992). Naval Reserve Line Commander Selection Boards reviewed Gillan's file in April 1994 and April 1995 but failed to promote him to Commander, a not surprising decision given his non-involvement with the Reserves. In 1997, two years after his transfer to an inactive status, Gillan tried to renew his activity in the Naval Reserve by participating in training drills. After Gillan participated in drills for five months, the Navy notified him in

March 1998 that he could no longer participate in reserve activities because a Lieutenant Commander who twice fails selection for Commander must be discharged after twenty years of commissioned service. *See id.* § 105(3)(b). Another MDB considered Gillan's record in March 2001, and he was honorably discharged from the Naval Reserve on August 1, 2001.

In addition to challenging his discharge, Gillan has also requested that the Navy revise upward one grade on his 1990 fitness report, an annual performance review. He relies on a 1998 letter written by his former commanding officer. Gillan's commanding officer originally gave Gillan a grade of "B" for "Desirability [for] Command." Eight years later, he asked that this grade be changed to an "A." His stated justification for this change was, "Information received after report was written justifies a higher grade: specifically volunteered for Desert Storm. Outstanding command of his Maintenance Division." Letter from Captain Jorgensen, S.A., USNR, to Naval Personnel Command (Dec. 1, 1998). On a number of occasions, Gillan sought to have the Navy make this change to his 1990 fitness report and to vacate its decisions not to promote him, which would allow his continued service. He first petitioned the Navy in 1998. The BCNR considered and then rejected this request on June 24, 1999. Two subsequent petitions for rehearing were denied in 2001 and 2002 because Gillan failed to present new or material evidence that had not been previously considered. Gillan finally wrote the Assistant General Counsel of the Navy in 2003 seeking reconsideration, which was granted. A new BCNR weighed Gillan's petition but once again recommended to the Secretary of the Navy that relief be denied. Gillan then turned to the federal courts. The district court granted summary judgment for the Navy, holding that, "Because the Navy was under no obligation to transfer Gillan before it did, the [BCNR]'s decision that Gillan was properly considered for, and denied, promotion was not arbitrary and capricious." *Gillan v. England*,

No. 04-311, 2005 WL 3213900, at *4 (D.D.C. Nov. 1, 2005). The district court also denied Gillan's petition to change his fitness report because Navy regulations only permit commanding officers to make changes to fitness reports within two years of the report. *Id.* at *5.

## II.

We review an agency's interpretation of a statute it administers under the two-step process of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). We first determine whether "the intent of Congress is clear." *Id.* at 842. If it is, then "that is the end of the matter," *id.*, and we enforce the plain language of the statute regardless of the agency's views. If the intent of Congress is not clear from the language of the statute because "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. "At the same time," because the BCNR decision was also a final agency action, the APA requires us to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Shays v. FEC*, 414 F.3d 76, 96 (D.C. Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)); *see also Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997) (deferring "to the Board's decision unless it is arbitrary and capricious, contrary to law, or unsupported by substantial evidence"). More specifically,

> Although we have jurisdiction to review the decisions of the Correction Board, we do so under an "unusually deferential application of the 'arbitrary or capricious' standard" of the Administrative Procedure Act. *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989); *see Kidwell v. Department of the Army*, 56

F.3d 279, 286 (D.C. Cir. 1995).

*Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000) (footnote omitted). We review *de novo* the district court's grant of summary judgment for the Navy. *See, e.g., id.*; *Frizelle*, 111 F.3d at 176.

Gillan first argues that 10 U.S.C. § 12642(b) requires that the Navy conduct an annual screening of all reservists followed by an immediate transfer to inactive status of those who failed to qualify for active status. Under Gillan's view of the statute, the Navy should have transferred him from the Ready Reserves to an inactive status earlier than it did and, in what is crucial for his argument, he would then not have been considered for and passed over for promotions in 1994 and 1995. Without these failed promotions, which only came about because he was mistakenly classified in an active status at a time when he was qualified for an inactive status, Navy regulations would have allowed Gillan to continue his Reserve service. In effect, Gillan argues that the Navy should interpret § 12642(b) to protect him from his own inactivity and his failure to request a transfer to inactive status. We read 10 U.S.C. § 12642(b) differently. Turning first to the text of the statute:

> (b) Subject to section 12645 of this title, a reserve commissioned officer who fails to attain the number of points, or to conform to the standards and qualifications, prescribed in subsection (a) shall—
>
> (1) be transferred to the Retired Reserve if he is qualified and applies therefor;
>
> (2) if he is not qualified or does not apply for transfer to the Retired Reserve, be transferred to an inactive status, if he is qualified therefor; or
>
> (3) if he is not transferred to the Retired

> Reserve or an inactive status, be discharged from
> his reserve appointment.

10 U.S.C. § 12642(b). Gillan is correct that the word "shall" limits the Secretary's discretion and in fact requires the Navy to transfer to an inactive status or the Retired Reserves a Ready Reservist who fails to fulfill the obligations of that category. But nowhere does the statute impose a time requirement for such a transfer. Gillan argues, however, that § 12642(b) must be read together with 10 U.S.C. § 10149, which requires the Navy to implement a system of "continuous screening," and other Navy and Department of Defense regulations that speak of an annual "screening," *see* BUREAU OF NAVAL PERSONNEL INSTRUCTION 1001.39A § 2102 (1992); 32 C.F.R. § 44.5(c)(1). When so read, they create, according to Gillan, a process in which the Navy conducts an annual screening of reservists' status, followed by a mandatory immediate transfer to inactive status for those who have failed to maintain the requirements of an active reservist. But Gillan's argument conflates the requirements of an annual "screening," called for by Navy and Department of Defense regulations, with the obligation to "transfer" reservists who no longer qualify for active status, called for in 10 U.S.C. § 12642(b). Screening is certainly an understandable prerequisite to transfer. One would expect the Navy to identify those reservists who are eligible for transfer from active status or discharge from the Reserves. But it does not follow that the Navy's "screening" process should be read into the "transfer" statute to require the Navy to transfer reservists immediately after screening.[1]

---

[1] The district court found that the Navy violated its own screening regulations because it could not explain the failure of the 1994 MDB to screen Gillan and therefore failed to "annually" screen Gillan. *Gillan*, 2005 WL 3213900, *2. The

Congress has determined that the Navy's decision to transfer a reservist to an inactive status cannot be based solely on an individual's performance. The Navy must consider the needs of the service as well. For example, 10 U.S.C. § 10149 directs the Secretary to provide a system of screening the Reserves so as to ensure that, among other things, there is a "proper balance of military skills," 10 U.S.C. § 10149(a)(2), and "[t]hat except for those with military skills for which there is an overriding requirement, members having critical civilian skills are not retained in numbers beyond the need for those skills," *id.* § 10149(a)(3). Based on its discretion and a determination of its needs, the Navy could choose not to transfer immediately a delinquent reservist from the Ready Reserves. The facts presented here—taking three years to transfer an admittedly unresponsive reservist—do not require us to address the outer limits of the Navy's discretion. Congress was certainly free to eliminate this discretion by writing a specific timeline into the statute, but it has chosen not to restrain the Secretary in this way.

---

district court found that this was not enough, however, to warrant Gillan's requested relief because it was the Navy's failure to screen *and transfer* him to inactive status that led to his failed promotions. *Id.* The Navy argues that Gillan was in fact screened because "screening" includes "administrative activities performed independent of and antecedent to the MDB." Appellee's Br. at 26. According to this view, screening would include the decision to send Gillan's record for MDB review and any attempts to notify Gillan of the MDB proceedings. We need not reach the issue of whether the Navy violated its own screening regulations because, even assuming that the Navy failed to timely screen Gillan for transfer to inactive status, nothing in the statute or the regulations mandates immediate transfer to inactive status after screening.

In addition to the substantial deference we traditionally give to decisions involving military personnel, we also give considerable deference to an agency's control over timelines. *Cf. Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir. 1983) ("Absent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of a rulemaking proceeding is entitled to considerable deference.") (footnotes omitted).  Gillan is thus asking this Court to restrain the Navy's discretion to make personnel decisions and intrude upon its ability to allocate resources.  Framing the question in this manner makes the answer clear.  Because Congress has not spoken to the issue of a timeline, we must defer here to the Navy's permissible interpretation of 10 U.S.C. § 12642(b) that gives the Navy discretion in determining the timing of transfer. Gillan has presented no credible argument other than his rejected statutory interpretation that the BCNR was arbitrary or capricious in finding that he was properly considered for and denied promotion.

Gillan also asserts that the Navy erred when it failed to permit him to correct one grade on his 1990 fitness report based on his former commanding officer's 1998 letter.  The BCNR denied Gillan's request because, "The reporting senior's letter, some eight years after the fact, does not persuade the BCNR that a change was warranted.  The Board notes that the Petitioner may ask the NPC [Naval Personnel Command] to file the letter in his record with the report to which it relates."  BCNR Decision at 4.  Although the Navy could have undoubtedly offered a more detailed denial, "[a] reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Frizelle*, 111 F.3d at 176 (quotation marks and citations omitted).  In fact, the Navy need only show that the BCNR's decision contains a "rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). In this case, the fact "found" is that this correction was submitted eight years after the initial fitness report. The BCNR need not address other factors because the letter requesting the change does not explain why it took Gillan's former commanding officer eight years to make this recommended change. Navy regulations specify that fitness reports can be changed by the reporting senior (commanding officer) within two years from the end of the report. BUREAU OF NAVAL PERSONNEL INSTRUCTION 1610.10 Rule P-4 (1995). "Supplementary material submitted more than 2 years after the report ending date [] will be accepted only if the reporting senior demonstrates in a cover letter," to the satisfaction of the appropriate official, "why the material could not have been submitted in a more timely fashion." *Id.* Rule P-4(c). The Navy's path, although not a model of clarity, can be discerned—this request was submitted outside of two years, and the sparse request failed to comply with requirements for late submissions. *See Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986) ("[I]f the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, we will make the reference.") (quoting *Envtl. Def. Fund, Inc. v. EPA*, 465 F.2d 528, 537 (D.C. Cir. 1972)).

## III.

For the foregoing reasons, the district court's grant of summary judgment is affirmed.

*So ordered.*